UNITED STATES GYPSUM COMPANY, a foreign corporation, Plaintiff in Error,

v.

STATE of Oklahoma ex rel. Ross RUTHERFORD, County Attorney, Defendant in Error.

No. 37752.

Supreme Court of Oklahoma.

July 8, 1958.

Rehearing Denied July 30, 1958.

Monnet, Hayes & Bullis, Oklahoma City, MacLeish, Spray, Price & Underwood, Chicago, Ill., for plaintiff in error.

Ross Rutherford, County Atty., Tal Oden, Altus, for defendant in error.

HALLEY, Justice.

This is an action to recover penalties for the unlawful owning and holding of farm land in Jackson County by the State ex rel. The County Attorney of that county, and against United Gypsum Company, a foreign corporation domesticated in Oklahoma, and herein referred to as "Gypsum", in violation of the Oklahoma Constitution, Art. 22, Sec. 2, and the applicable statutes of Oklahoma, 18 O.S.1951 §§ 1.20 through 1.25. The case was tried to the court and resulted in a judgment for the plaintiff, and the defendant has appealed.

Plaintiff alleged that on December 12 and 18, 1903, the defendant acquired by purchase the fee simple title to about 550 acres of rural or farm land in Jackson County, Oklahoma, which was not necessary and proper for the transaction of the business for which the corporation, Gypsum, was engaged in and was in violation of the laws of Oklahoma, being outside the corporate limits of any incorporated town in Jackson County; that Gypsum held the title and possession of such land until August, 1955, such ownership and possession being contrary to the Constitution and statutory laws of this State, as above cited, and that Gypsum became liable to the State for a penalty for each year, or fraction of a year such land was unlawfully

held, based upon the assessed valuation of the land for ad valorem taxes.

Plaintiff alleged that such holding by Gypsum was not proper or necessary for the transaction of the business for which Gypsum was created and in excess of that permitted by the laws of Oklahoma.

Plaintiff, prior to the filing of this action, gave to Gypsum a written notice of the penalties due by it to the State, together with a collection fee, and such penalties are now due and unpaid, being $10,592.35, together with the collection fee and interest due. The years covered are from 1937 to 1955, both inclusive, and Gypsum had failed to offer or pay any part of the amount alleged to be due the State when the suit was filed on January 28, 1956.

Defendant answered by general denial and admitted that it had acquired and held the land since its purchase in 1903 until the last was sold in June, 1955; that the land was proper and necessary to its use in producing gypsite plaster, one of the building materials manufactured and distributed by Gypsum, and was so used from the time of its acquisition up to and including 1953; that due to economic conditions and war, there were periods of inactivity and this land was held in reserve for the production of gypsite plaster; that when it was determined in 1953 that the demand for gypsite had declined so that it would not likely pay to operate its plant again, Gypsum decided to sell the plant and land, and did so as promptly as possible.

Defendant alleged that Sec. 1.23 of 18 O.S.1951 is invalid and in violation of our State Constitution, Sec. 2, Art. 22, in that it purports to authorize, upon the payment of a penalty, a thing which is specifically prohibited by the Constitution; and that since it acquired title to the land prior to Statehood defendant's title is not affected by Sec. 2, Art. 22, and that to enforce the penalties provided by Sec. 1.23, 18 O.S.1951, would violate both the State and Federal Constitutions.

The evidence discloses that Gypsum acquired the land involved in fee in 1903, for the purpose of establishing a Gypsum plant. It had a plant at Okarche, one at Sweetwater, Texas, and at Laramie, Wyoming, and did a very heavy business, sales amounting to three million dollars per year.

In 1908 the plant near Eldorado, Jackson County, was opened. It operated most of the time until 1937, when it was shut down for the reason that the demand for gypsite, a brown wall plaster, had declined until the plant could only be operated at a loss. During the depression years the demand declined. During the war years the demand for gypsite was largely supplied by the use of wall plaster processed at other plants. After the plant was closed in 1937 most of the machinery was left on the premises and was well cared for with a view of opening the plant when the demand for gypsite, the only product produced at that plant, increased.

During the years from the closing of the plant in 1937 until it was sold in 1955, the officials of the plant were constantly investigating conditions with a view of reopening it when conditions justified. Four high officers of Gypsum spent four days at the plant in 1946, investigating conditions. It was not until 1953 that Gypsum finally decided to abandon the idea of reopening the plant, and at once offered the plant and land for sale. Oliver M. Knode, president who had been connected with the company for many years, testified at length that until 1953, the company had hopes of reopening the plant.

Gypsite is produced by a process known as strip mining, where a formation is found near the surface and the soil is stripped off the gypsum formation with scrapers and the deposit is then removed and transported to the plant. The formation is in patches of various sizes and areas. The part of the 550 acre tract not being in actual strip mining operations was leased for farming and grazing, even before the plant was closed. Many of the farm leases are shown

in the record. We note that Gypsum reserved in these leases the right to mine the land at all times, and to reimburse the tenants for damages done to growing crops.

■ Plaintiff contends that this leasing was unlawful and proof of an intent by Gypsum to retain the land indefinitely regardless of its use for mining. The record shows that the rents received off-set the taxes, insurance and care of the property and kept it in a more presentable condition and would make reopening of the mines easier. Gypsum did not profit by this leasing, but suffered a loss of some $10,000, but cost of maintenance was reduced by whatever could be obtained by renting.

It is not contended by Gypsum that it may own farm land and cultivate it or graze it under the law prohibiting the ownership of rural land by corporations. Under the circumstances before us, the leasing of the land was only incidental to the primary purpose in owning it and not proof that it was so held and leased for the purpose of evading the law against ownership beyond the amount of land proper and necessary for the operation of its lawful business.

Plaintiff also contends that the ownership of the minerals was all that Gypsum needed and was entitled to carry on its strip mining operations. We shall discuss this question later.

Gypsum submits that it owned and held the land in good faith as a plant site and source of raw material for expected future use.

Sec. 2, Art. 22, of the Oklahoma Constitution provides in part as follows:

"No corporation shall be created or licensed in this State for the purpose of buying, acquiring, trading, or dealing in real estate other than real estate located in incorporated cities and towns and as additions thereto; nor shall any corporation doing business in this State buy, acquire, trade, or deal in real estate for any purpose except such as may be located in such towns and cities and as additions to such towns and

cities, and further except such as shall be necessary and proper for carrying on the business for which it was chartered or licensed; * * *".

■ It has been held several times by this Court that the above provision is not self-executing. Texas Co. v. State, 198 Okl. 565, 180 P.2d 631, and earlier cases. In 1908 our statutes provided for escheat of lands held in violation of the above constitutional inhibitions. In 1937 the escheat law was repealed and the present penalty provisions were enacted, which were amended in 1947, and now appear in part as 18 O.S.1951 § 1.20 et seq. as follows:

Section 1.20

"a. No corporation of any sort, whether coming within the general scope of this Act or not, shall, except as herein provided, own, hold, or take any real estate located in this State outside of any incorporated city, or town, or any addition thereto.

"b. Nothing in this Act shall be construed as prohibiting the owning, holding, or taking of:

"(1) Such real estate as is necessary and proper for carrying on the business for which any corporation has been lawfully formed or domesticated in this State."

Section 1.23

"a. Any corporation owning or holding any real estate in violation of the provisions of Sections 20 and 21 of this Act shall, in addition to other penalties provided by this Act, be required to pay, for each year, or fraction thereof, during which such title or interest is thus unlawfully owned or held, the following penalties: * * *"

One per cent of the assessed valuation is fixed for the first year that land is held unlawfully by a corporation, which is increased one per cent each year thereafter up to six per cent.

Has the State proved a prima facie case of abandonment? Kentucky has a prohibition against corporate ownership of rural lands very similar to ours, but is enforced

by a penalty of escheat. In German Ins. Co. v. Commonwealth, 141 Ky. 606, 133 S.W. 793, 798, the Supreme Court of Kentucky said:

"It is not so much the time for which real estate is held, but the purpose for which it was acquired, the intention with which it is held, and the use to which it is to be put, and the necessity for this use, that determines the right of the corporation to hold it."

And further on in the opinion, the court made the following statement:

"* * * The time for which the property is held is not the test of the right to hold it, but is the purpose for which the property is acquired, and the ever present intention of devoting it to a use that will be proper and necessary in carrying on its legitimate business that fixes the right of the corporation to hold and denies the right of the commonwealth to take during the time it is so held. * * *"

In Louisville & N. R. Co. v. Commonwealth, 151 Ky. 325, 151 S.W. 934, 937, the Kentucky court had before it a case where defendant owned property for contemplated future use, and leased it to a lumber company for a coal yard. The court said:

"* * * The evidence being sufficient to show a reasonable necessity for the future use of lots 4 and 5, we do not think they should be escheated merely because the railroad in the meantime is leasing them to its shippers, in order not only to encourage the business of its patrons, but to enable it to handle the business more conveniently and at less expense. * * *"

It was pointed out by the plaintiff that those preparing our Constitution and inserting the prohibition against corporations owning rural lands was to avoid an influx of tenant citizens. It occurs to us that the rental of land not immediately necessary and proper for corporate purposes is in keeping with the spirit of the Constitution because it avoided idle rural land while being held for future corporate use. The lessees profited by use of the land that would have been idle while Gypsum waited to determine whether the demand for gypsite, the only product produced at the plant, would justify reopening the plant. We do not think the temporary leasing of the land for farming and grazing was sufficient to justify the conclusion that Gypsum had abandoned reopening the plant. The evidence clearly showed that the holding of the land was with the intention of resuming operations when conditions warranted. The holding of the land while the plant was idle but carefully preserved and cared for indicated that the holding was in the hopes of resuming operations.

In Texas Co. v. State, supra [198 Okl. 565, 180 P.2d 639], the State sought to escheat various tracts owned in fee by The Texas Company, some of the land being held for the production of oil and gas, some for operation of gasoline plants, and buildings for the occupancy of employees. The court gave a sound meaning to the words "necessary and proper" in part in the following language:

"Concerning the construction of the words 'necessary and proper' as used in the statute by reference to the constitutional provision reliance is placed on the following statement in Fletcher on Corporations, Vol. 6, § 2788:

"'Consideration should be given, in determining the right, to the object of acquisition, the intention with which the property is held, and the use to which it may be and is designed to be put, and the implied power of the corporation is to be limited to such real property as is reasonably necessary to such corporate purposes and uses.

"'The property need not be necessary in the sense of indispensable, but it is sufficient if it is convenient and proper under the circumstances, and not inconsistent with the legitimate objects of the corporation.'"

It was held in the foregoing case that "* * * defendant has the right to hold

the fee simple title in lands in cases where the same is specifically used and useful and proper and necessary in the general operation of defendant's business in this state." The mining of gypsite requires the use of almost the entire surface of the ground from which it is taken. It differs from the production of oil and gas in this regard.

The term "necessary and proper" are interpreted as meaning "essential to its business" in Wolfe v. State, 163 Okl. 180, 21 P.2d 1067, 1069. The facts before us show that the object of acquisition by Gypsum was legal, the use of the land to provide a plant site was legal and from 1903 to 1937 was not questioned by the State. The intention of Gypsum in holding the property from 1937 to 1953 was lawful as viewed by the uncontradicted testimony of Gypsum's officers.

In the Kentucky case of Commonwealth v. Kentucky Traction Co., 140 Ky. 387, 131 S.W. 16, the court held that the five year period prescribed by the statutes and Constitution of that State within which a corporation must convey property not held for a proper purpose commenced to run only when the corporation abandons any purpose to use the land in its corporate business.

Again in German Ins. Co. v. Commonwealth, supra, the insurance company had bought a lot adjoining its present building for the purpose of enlarging such building, and intended to move its offices into the new structure but discarded such plan when a banking company sharing the insurance building purchased a new lot and erected a new building sufficient for both. Escheat was denied on the theory that the law permits business concerns to look forward to the time when its needs will be greater and should be permitted to prepare in advance for conditions that may arrive in the future.

In Commonwealth v. Mehler & Ecksten-kemper Lumber Co., 183 Ky. 11, 208 S.W. 13, 14, the corporation acquired property at foreclosure sale, but did not devote the land to "any proper or necessary use in carrying on its legitimate business." The defendant contended that it held the lot for future use for a branch lumber yard. The president of the lumber company testified that it was the purpose of the company to establish branch yards. The court commented upon this evidence in the following language:

"* * * This evidence, in our judgment, under the circumstances, was competent evidence to prove the intention of the company in holding the lot in question for a longer period than 5 years, and was substantial proof, and, not being contradicted, sufficient to sustain the defendant's plea, that it was holding the lot in question in anticipation of its future use for a legitimate corporate purpose, with an ever-present purpose to devote it to such use."

The State contends that it was not necessary and proper for Gypsum to own and hold the fee title as distinguished from the mineral title. We cannot agree with this contention. In Texas Company v. State, supra, this Court held that an oil company was not required to hold the fee in order to produce oil and gas.

The Court said in that opinion:

"As to the possibility that those rights enjoyed which were beyond the grant of an ordinary oil and gas lease could have been secured by further leases, it need only be said the law makes no such requirement, nor no prescription as to the method. The sole question is whether the acquisition of the fee, in contemplation of law, was actually fairly and properly needful from the standpoint of the proper operation of a lawful enterprise. Such clearly appears from the facts and the court's finding, and it follows the judgment escheating this tract was erroneous."

After a thorough review of the facts in this case we are convinced that Gypsum owned and held the land involved in this case in perfect good faith as a plant site and a source of raw materials for expected

future use and that the demurrer to plaintiff's evidence should have been sustained.

Since we hold as we do it is unnecessary to discuss the other questions raised by Gypsum.

The judgment is against the clear weight of the evidence and contrary to law, and is therefore reversed with directions to render judgment for Gypsum, the plaintiff in error.

WELCH, C. J., and DAVISON, JOHNSON, WILLIAMS, BLACKBIRD, JACKSON and CARLILE, JJ., concur.

CORN, V. C. J., dissents.